Christopher J. Marcus, P.C.
Lauren Friedman
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

W. Benjamin Winger (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

*Counsel to the Foreign Representative*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 15 |
| | ) |
| CHINA HOSPITALS, INC.,[1] | ) Case No. 19-13767 (____) |
| | ) |
| | ) |
| Debtor in a Foreign Proceeding. | ) |
| | ) |

### DECLARATION OF FOREIGN REPRESENTATIVE
### PURSUANT TO 11 U.S.C. § 1515 AND RULE 1007(a)(4) OF
### THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IN
### SUPPORT OF VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN
### MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,
### AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE

I, Cosimo Borrelli, to the best of my knowledge, information, and belief, state as follows:

1.      I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration based upon my own personal knowledge except for those portions specified as being otherwise. I am making this declaration in accordance with section 1515 of title 11 of the United States Code (the "Bankruptcy Code") and rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[1]      China Hospitals, Inc. is the debtor in this chapter 15 case. China Hospitals, Inc. is a Cayman Islands exempt limited liability company with registration number 138088. The location of China Hospitals, Inc.'s registered office is c/o Borrelli Walsh (Cayman) Limited, P.O. Box 30847, 3rd floor Strathvale House, 90 N. Church St., George Town, Grand Cayman, KY1-1204, Cayman Islands.

2.      Mr. Luke Almond and I are the joint official liquidators (the "JOLs") of the

above-captioned debtor ("China Hospitals" or the "Debtor") that is subject to a liquidation

proceeding before the Grand Court of the Cayman Islands (the "Cayman Islands Proceeding").

I am the foreign representative (the "Foreign Representative") of the Debtor and duly authorized

to commence this chapter 15 case.

3.      I submit this declaration in support of:  (a) the official form chapter 15 petitions for

the Debtor;  (b) the *Verified Petition for (I) Recognition of Foreign Main Proceeding,

(II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the

Bankruptcy Code* (the "Verified Petition"); and (c) the *Emergency Motion for Provisional Relief

Pursuant to Section 1519 of the Bankruptcy Code*.

**Background**

**I.      The Classroom Investment and Arbitration**

4.      In January 2014, Classroom Investments Inc. ("Classroom") entered into a share

purchase and subscription agreement (the "SPA") and shareholder's agreement (the "SHA") with

China Hospitals' founder, former director, and indirect majority shareholder (the "Founder") and

his companies, including China Hospitals (the "Transaction"), pursuant to which Classroom would

acquire approximately twenty percent (20%) of China Hospitals in exchange for $175,000,000.[2]

The proceeds of the Transaction paid into China Hospitals were earmarked to be used ***first***, in

payment and satisfaction of the consideration to acquire Puyang Oilfield General Hospital

("Puyang Hospital") (*i.e.*, RMB 700,000,000), ***second***, in payment and satisfaction of the

---

[2]      $10,000,000 of the total $175,000,000 consideration was paid to Dragon Dosan Technology Limited ("Dragon Dosan") as the purchase price for 505,522 then-outstanding common shares of China Hospitals held by Dragon Dosan, with the remaining $165,000,000 paid to China Hospitals in exchange for 8,341,118 newly-issued "Ordinary B" shares.  SPA § 3.  All pre-transaction common shares of China Hospitals were then converted to "Ordinary B" shares in connection with the Transaction.  SPA § 4.

consideration to acquire Qingfeng People's Hospital ("Qingfeng Hospital") (*i.e.*, RMB 62,420,000), **third**, in payment and satisfaction of the consideration to acquire Anqiu People's Hospital (*i.e.*, RMB 50,544,953) and Shouguang People's Hospital (*i.e.*, RMB 99,805,819) (the foregoing hospitals collectively, the "Additional Hospitals," and the total consideration therefor, the "Additional Hospitals Consideration"),[3] and **fourth**, for general corporate purposes of China Hospitals. Pursuant to the SPA, the then-contemplated post-Transaction structure chart of China Hospitals was as follows:



Contemplated Post-Transaction China Hospitals Group
Structure Chart

---

[3]   The Additional Hospitals were all located in the People's Republic of China (the "PRC"). The Additional Hospitals Consideration of RMB 912,770,772 was equivalent to approximately $150.6 million based on the spot exchange rate as of the date of the SPA.

5.      China Hospitals would then, within thirty (30) months, float its shares in an initial public offering ("IPO").

6.      The SPA contained express representations, warranties, and covenants in favor of Classroom.  For example, the SPA dictated the specific terms and sequence by which China Hospitals would use the proceeds of Classroom's share purchase to acquire the four specified Additional Hospitals in the PRC.  Nevertheless, contrary to the express terms of the SPA, the Founder instead directed Classroom's funds to a different bank account under his control, breaching the SPA less than two months after entering into it.[4]  The SHA, in turn, contained negative covenants that certain actions (the "Fundamental Decisions") could not be undertaken without Classroom's prior written approval.  The Fundamental Decisions include, among other things:  "(2) [Entering into a]ny transaction with a connected person that is not on an Arm's Length Basis . . . ; (5) Dissolv[ing], liquidat[ing], reorganiz[ing] or restructur[ing] [China Hospitals] or any Subsidiary; (6) Sell[ing] or dispos[ing] of all or substantially all of the assets of [China Hospitals]; [and] (7) Merg[ing], amalgamat[ing] or consolidat[ing] [China Hospitals] or any Subsidiary with any other entity."  The SHA also provides that the Founder shall not own any interest in, manage, or control any competing business.

7.      During an October 2014 meeting regarding the Additional Hospitals transactions, Classroom learned of a "potential restructuring" of China Hospitals, pursuant to which China Hospitals would enter into a pre-IPO bridge facility with China Healthcare Inc. ("Healthcare") and its non-PRC subsidiaries as guarantors.  Healthcare (not China Hospitals) would then be listed for the contemplated IPO.  Healthcare is wholly-owned by the Founder and was not then party to any

---

[4]    Loan documents show that the funds were directed to an improper bank account between February 27 and March 10, 2014.

4

Classroom transactions.  Pursuant to the transaction, the Additional Hospitals would be indirectly

wholly owned by a Healthcare (not China Hospitals) subsidiary.



8.      The structure suffered from a number of infirmities, including (a) the proposed IPO

listing entity was Healthcare (not China Hospitals), a company in which Classroom had no rights

or economic interest, and (b) Healthcare held several subsidiaries and one of these subsidiaries,

Beijing Wanshitaiping Hospital Management Co., Ltd ("BJ WSTP"), a PRC company, had already

acquired two of the Additional Hospitals in flagrant violation of the SHA.  These transactions

effectively stripped Classroom of its bargained-for economic interest in China Hospitals—

including ownership in the Additional Hospitals that were the subject of the transactions contemplated by the SPA—and created a parallel corporate structure under Healthcare.

9.      On November 3, 2014, Classroom issued a notice of breach under the SPA. Following such notice, the parties engaged in negotiations in good faith pursuant to clause 25 of the SPA. During the course of those negotiations, Classroom learned that, on May 17, 2013 and June 30, 2013, respectively—in each case **prior to** entering into the Transaction—the Founder had entered into parallel agreements to acquire Puyang Hospital and Qingfeng Hospital for the benefit of BJ WSTP, which he ultimately completed using proceeds of the Transaction. Classroom also learned that, on June 19, 2014—**following** entry into the Transaction—the Founder had covertly attempted to cause a China Hospitals subsidiary to transfer Mengzhou Hospital to BJ WSTP.[5]

10.      When it became clear that a resolution was not possible, Classroom obtained injunctions in Hong Kong and the Cayman Islands that restrained the Founder, China Hospitals, Healthcare, and other defendants from disposing of traceable proceeds of the Transaction that Classroom was then able to identify.

11.      On December 17, 2015, the parties referred their dispute to arbitration before the Hong Kong International Arbitration Centre (the "Arbitration"). The arbitral tribunal was composed of three highly-respected arbitrators, namely Dr. Michael Pryles, Dr. Michael Moser, and Professor Bernard Hanotiau, who was jointly appointed by the parties as presiding arbitrator. In April 2016, while the Arbitration was pending, Classroom learned that China Hospitals indirectly held only 32% and 13.8% ownership interests, respectively, in Shouguang Hospital and Anqiu Hospital—not 100% ownership interests as had been represented by the Founder at the time

---

[5]   While the Founder later claimed that this transfer was not completed, Classroom later learned that Mengzhou Hospital is not registered with any of the authorities in the PRC with whom it is expected to be registered, and, therefore, its true ownership cannot be determined.

of the Transaction—and were unable to obtain confirmation of China Hospitals' indirect
ownership interest in Mengzhou Hospital, which the Founder had similarly represented to be 100%
at the time of the Transaction.

12.    In connection with the Arbitration, Classroom hired Luke Steadman, a Fellow of
the Institute of Chartered Accountants in England and Wales and a Partner at Alvarez & Marsal
Disputes and Investigations, LLP (the "A&M Expert"), to conduct a fund flow analysis in relation
to the $175 million paid by Classroom in connection with the Transaction, to determine (as far as
documents made available to him allowed) subsequent movements of those funds, and to prepare
an expert report documenting his findings.  On August 15, 2016, Mr. Steadman completed his
*Expert Report of Luke Steadman, FCA*, and on August 14, 2017, Mr. Steadman completed his
*Supplemental Expert Report of Luke Steadman, FCA* (together, the "Expert Reports").[6]  While the
A&M Expert was able to definitively trace how funds flowed within the overall China Hospitals
and Healthcare "system," he was unable to determine the ultimate disposition of a total of
$104.3 million (out of the $175 million paid by Classroom) which was paid to third parties outside
the China Hospitals and Healthcare system in abrogation of the funds flow mechanics
contemplated by the Transaction.

13.    On June 15, 2018, the arbitral tribunal issued a final award (the "Final Award"),[7]
finding that:  (a) the Classroom investment was used to complete the acquisition of the Additional
Hospitals for the benefit of Healthcare, in which Classroom held no interest; (b) the Founder made
fraudulent representations to Classroom about the acquisitions of the Additional Hospitals;
(c) the Founder's representations made in the SHA about the intention to seek an IPO were not

---

[6]    The Expert Reports were submitted to the arbitral tribunal as evidence in the Arbitration.

[7]    A true and correct copy of certain relevant excerpts from the Final Award is attached hereto as **Exhibit A**.

true at the time of the Transaction; (d) without the representations made by the Founder, Classroom would not have entered into the SPA or SHA; and (e) the Founder, China Hospitals, and the other respondents in the Arbitration[8] were liable for conspiracy to induce Classroom to enter into the Transaction without providing Classroom with an interest in the Additional Hospitals.  The arbitral tribunal also found that the funds Classroom invested in China Hospitals under the Transaction were misappropriated by the Founder and transferred in an "anarchic" way to various parties.

14.     The Final Award held that the Founder and the other individual Respondent had been the "controlling minds" of the companies involved in the scheme which caused Classroom to invest in China Hospitals on the basis of fraudulent misrepresentations, all while knowing that the funds invested would be misappropriated for the benefit of Healthcare, in which Classroom held no interest.  Accordingly, the Final Award was issued in the amount of $231,805,125.09, comprising the sum of (a) Classroom's original investment of $175,000,000, (b) interest accrued from January 29, 2014 to June 15, 2018 in the amount of $45,969,863.01 as well as post-award interest at a rate of 8% from June 15,2018 until complete payment, and (c) costs in the amount of $10,835,262.08 (collectively, the "Arbitration Award").[9]  Together with the Founder and the other Respondents, China Hospitals is jointly and severally liable for the Arbitration Award.

---

[8]     The respondents in the Arbitration include the Founder, China Hospitals, Healthcare, Beijing Raisechina Consulting Co., Ltd, Lhasa Dongjun Healthcare Co. Ltd, Dragon Dosan Technology Limited, Best Strive International Limited, Fortune Global International Limited, Wonder Effect Limited, Capital Basin Enterprises Limited, HK Dongjun Hospitals Investment and Management Limited, HK Wanshitaiping Investment and Management Limited, Beijing Wanshitaiping Hospital Management Co., Ltd, and an individual PRC citizen (collectively, the "Respondents").

[9]     As a result of distributions made in connection with the Cayman Islands Proceeding, the current outstanding balance of the Arbitration Award is $164,498,655.65.

## II.    The Cayman Islands Proceeding

15.    On June 20, 2018, Classroom served a demand for payment of the Arbitration Award by no later than June 28, 2018 on China Hospitals.[10]

16.    On June 28, 2018, after China Hospitals and the other Respondents failed to pay the Arbitration Award by the June 28 deadline, and to prevent dissipation of the assets of China Hospitals, Classroom petitioned the Cayman Court to appoint Ms. Samantha Wood and I of Borrelli Walsh (Cayman) Limited as joint provisional liquidators (the "JPLs") of China Hospitals. The JPLs were appointed to China Hospitals pursuant to an order of the Cayman Court dated July 3, 2018 (the "JPL Order").[11]

17.    Also on June 28, 2018, Classroom petitioned the Cayman Islands Court to have China Hospitals wound up in accordance with the Cayman Islands Companies Law (the "Companies Law")[12] on the grounds that, *inter alia*, China Hospitals was unable to pay its debts as they came due and that it was otherwise just and equitable that China Hospitals be wound up.  By order dated September 13, 2018, the Cayman Court appointed the JPLs as the JOLs of China Hospitals (the "JOL Order").[13]  Thereafter, the Cayman Court issued an order dated on January 15, 2019 appointing Mr. Luke Almond of Borrelli Walsh (Cayman) Limited as successor JOL to replace Ms. Wood.[14]

---

[10]    On June 26, 2018, Classroom served a demand for payment of the Arbitration Award by no later than June 28, 2018 on China Hospitals via letter to China Hospitals' registered office.

[11]    A copy of the JPL Order is attached to the Verified Petition as Exhibit C.

[12]    A copy of the Companies Law is attached to the Verified Petition as Exhibit B.

[13]    A copy of the JOL Order is attached to the Verified Petition as Exhibit D.

[14]    Ms. Wood had given notice on December 13, 2018 of her intention to resign as JOL.

18.    Following appointment of the JOLs, the Founder attempted to transfer ownership of two hospitals in the PRC—Puyang Hospital and Qingfeng Hospital,[15] both of which had been acquired using Classroom's share purchase proceeds—to an unrelated Beijing company. The Founder also unsuccessfully attempted to transfer all cash held by Puyang Hospital to an unrelated Beijing company and to remove all of Puyang Hospital's books and records, but he was thwarted when officials at Puyang Hospital refused to cooperate with his demands.

19.    Since their appointment, the JOLs have succeeded in selling or otherwise disposing of all of the underlying assets of China Hospitals. As a result of such dispositions, China Hospitals no longer has any meaningful operations aside from the Cayman Islands Proceeding. The current structure of China Hospitals is set forth below:

**China Hospitals and China Healthcare Group Structure Chart**



### III. The Founder's Abuses of the Corporate Form and Disregard for Governance and Corporate Formalities

20.    The Founder's well-documented pattern and practice of attempting to siphon assets away from China Hospitals and otherwise hide assets from his and China Hospitals' creditors (*e.g.*, Classroom) underscores his history of abusing the corporate form and notorious disregard for

---

[15]    Puyang Hospital and Qingfeng Hospital were, at the time, indirectly wholly-owned by Healthcare.

governance rights and corporate formalities.  For example, as discussed herein, the Founder (i) refused to seek Classroom's prior approval prior to directing China Hospitals to perform acts that were Fundamental Decisions, in violation of the SHA, (ii) directed Classroom's payment under the Transaction to a different bank account than that contemplated by the SPA, (iii) failed to take best efforts to effectuate the contemplated transfers of equity in the Additional Hospitals under PRC law, and (iv) deprived China Hospitals of its anticipated ownership interest in the Additional Hospitals for the benefit of another company controlled by the Founder.  Moreover, even after injunctions were obtained against the Founder that prohibited the disposal of the traceable proceeds of Classroom's investment, he attempted (unsuccessfully) to transfer Puyang Hospital and Qingfeng Hospital to an unrelated Beijing company that would be outside the reach of China Hospitals and Classroom.

**IV.     China Hospitals' Creditors**

21.     China Hospitals has no funded debt and no ongoing trade obligations.  China Hospitals' liabilities consist of the Arbitration Award due to Classroom, amounts owed to Harney Westwood & Riegels (a law firm), and certain de minimis operating costs.

**V.     China Hospitals' Equity Interests**

22.     Approximately sixty percent (60%) of the issued shares of China Hospitals are held indirectly by the Founder.  The remaining shares of China Hospitals are held by Classroom (as to approximately 20%) and a number of individual shareholders (as to the remaining approximately 20%).

23.     As a consequence of the JOL Order, the JOLs are authorized to act for and on behalf of China Hospitals and exercise rights of ownership of and control over China Hospitals to the exclusion of China Hospitals' shareholders and directors.  *See* JOL Order ¶ 8.

## VI.    Appointment as Foreign Representative and Filing of the Verified Petition.

24.    The JOL Order authorizes me to "do any acts or things considered by [me] to be necessary or desirable in connection with the liquidation of the [Debtor] and the winding up of its affairs in the Cayman Islands and/or elsewhere" and to "make applications to, and seek assistance from, the courts of any foreign jurisdictions as may be necessary in the course of [my] conduct as JOL[] of the [Debtor] or for the purpose of carrying out any of the functions provided for" in the JOL Order. *See* JOL Order ¶¶ 7, 8(g). Accordingly, it is my understanding that I satisfy the definition of a "foreign representative" as that term is defined in section 101(24) of the Bankruptcy Code.

25.    The Debtor has property in the United States in the form of a retainer deposited in a client trust account at Citi Private Bank located in New York, New York. Additionally, the Debtor has property in the United States in the forms of (a) a professional retainer deposited in a client trust account at East West Bank located in Los Angeles, California, (b) claims and causes of action against the Founder, a U.S. citizen, for, among other things, contribution and breach of fiduciary duty, and (c) a deposit account held in the name of "China Hospitals, Inc," with account number XXXX XXXX 0398, at a U.S. branch of Bank of America, N.A. (the "Bank of America Account").[16]

26.    The JOLs became aware of the Bank of America Account while administering the Cayman Islands Proceeding. As of March 30, 2016 and upon information and belief, approximately $202.7 million in cash was deposited in the Bank of America Account. Bank of

---

[16]    In the event it is later determined that this account is held not in the name of the Debtor but in the name of a similarly-named entity organized under the laws of Delaware, I believe that the Debtor has claims to the account and funds contained therein on theories including alter ego and reverse-veil-piercing with respect to the Debtor's claims against the Founder.

America has indicated it will not provide additional information regarding this account or liquidate the amounts held therein absent a U.S. court order.

27.    I filed the Verified Petition pursuant to sections 1504 and 1515 of the Bankruptcy Code commencing this chapter 15 case in the Southern District of New York, seeking recognition of the Cayman Islands Proceeding as a "foreign main proceeding," and seeking other necessary or appropriate relief in support of the Cayman Islands Proceeding.  I have been informed that the Bankruptcy Code provides for recognition of a foreign proceeding as a "foreign main proceeding" if such foreign proceeding is a "foreign proceeding" pending in a country where the debtor has "the center of its main interests" ("COMI").  *See* 11 U.S.C. § 1517(b)(1).

28.    I have been informed that the Cayman Islands Proceeding is a "foreign proceeding" as it is a collective judicial proceeding authorized and supervised by the Grand Court of the Cayman Islands under the Cayman Islands Companies Law (2018 Revision).  It is my understanding that for these reasons, the Cayman Islands Proceeding qualifies as a "foreign proceeding" as that term is defined in section 101(23) of the Bankruptcy Code.  In compliance with section 1515(b) of the Bankruptcy Code, a certified copy of the JOL Order that commenced the Cayman Islands Proceeding is attached to the Verified Petition as Exhibit D.

29.    In addition, I believe that the Debtor has its COMI in the Cayman Islands.  China Hospitals' registered office is located at c/o Borrelli Walsh (Cayman) Limited, P.O. Box 30847, 3rd Floor Strathvale House, 90 N. Church St., George Town, Grand Cayman, KY-1204, Cayman Islands.

30.    Moreover, as described above, China Hospitals no longer has any meaningful operations aside from the Cayman Islands Proceeding.   The current structure chart for China Hospitals is below:



31.    Based on these facts, I believe that recognition of the Cayman Islands Proceeding as a foreign main proceeding is warranted.

32.    I also believe recognition of me as the Debtor's "foreign representative" and recognition of the Cayman Islands Proceeding as a "foreign main proceeding" are consistent with the purpose of chapter 15 and will allow the Debtor to liquidate and wind up in the most efficient manner without jeopardizing creditors' rights.

33.    For the reasons set forth in the Verified Petition, I submit that recognition of the Cayman Islands Proceeding is necessary and appropriate for the benefit of the Debtor, its creditors, and other parties in interest.

**VII.    Statement Pursuant to Section 1515 of the Bankruptcy Code.**

34.    I am informed that section 1515 of the Bankruptcy Code provides, in pertinent part, as follows:

(a)    A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

(b)    A petition for recognition shall be accompanied by—

(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

(c)    A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

35.    In satisfaction of section 1515(b) of the Bankruptcy Code, attached to the Verified Petition as Exhibit D, and incorporated herein by reference, is a true and correct copy of the JOL Order evidencing the Cayman Islands Proceeding and my authority to act as the Foreign Representative.[17]   In addition, in satisfaction of section 1515(c) of the Bankruptcy Code, attached to the Verified Petition as Exhibit E is a copy of an order, dated as of May 7, 2019, of the High Court of the Hong Kong Special Administrative Region recognizing the Cayman Islands Proceeding.   Therefore, the Verified Petition meets the requirements of section 1515 of the Bankruptcy Code in satisfaction of the third requirement under section 1517(a) of the Bankruptcy Code.

**VIII.    Disclosure Pursuant to Bankruptcy Rule 1007(a)(4).**

36.    I am informed that Bankruptcy Rule 1007(a)(4) provides, as follows:

In addition to the documents required under § 1515 of the Code, a foreign representative filing a petition for recognition under chapter 15 shall file with the petition: (A) a corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to

---

[17]    The Debtors reserve the right to supplement these materials in advance of or at the final hearing on the Verified Petition.

litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under § 1519 of the Code.

37.     I am further informed that Bankruptcy Rule 7007.1 provides in pertinent part that a corporate ownership statement:

> . . . identif[y] any corporation, other than a governmental unit, that directly or indirectly owns 10% or more of any class of the corporation's equity interests, or states that there are no entities to report under this subdivision.

## A.     Corporate Ownership Statement.

38.     In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(A), the following is a corporate ownership statement of the Debtor, which identifies any corporation that directly or indirectly owns 10 percent or more of any class of the Debtor's equity interests as of the date hereof:

- Classroom Investments, Inc., a wholly-owned subsidiary of Ontario Teachers' Pension Plan Board, directly owns 19.77% of China Hospitals, Inc.

- Dragon Dosan Technology Limited directly owns 47.24% of China Hospitals, Inc.[18]

## B.     List of Administrators.

39.     In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(B), the Debtor and the JOLs (including the Foreign Representative) shall maintain control of and be authorized to administer the Cayman Islands Proceeding.  The service address for the Debtor in this chapter 15 case is:  c/o Borrelli Walsh (Cayman) Limited, P.O. Box 30847, 3rd Floor Strathvale House, 90 N. Church St., George Town, Grand Cayman, KY-1204, Cayman Islands, Attn: Luke Almond.  I am not aware of any other persons or bodies authorized to administer the Cayman Islands Proceeding on behalf of the Debtor.

---

[18]   Dragon Dosan Technology Limited is wholly owned by the Founder.

### C.      Parties to Litigation Pending.

40.      The Debtor is not a party to any litigation in the United States at the time of the

commencement of this chapter 15 case.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed on this 24th day of November, 2019

*/s/ Cosimo Borrelli*
Cosimo Borrelli
Joint Official Liquidator
China Hospitals, Inc.

## Exhibit A

**Excerpts from Final Award**

**Regarding the Founder's U.S. Citizenship:**[1]

- ███████████, a citizen of the United States of America, whose address for the purpose of this arbitration is ████████████████████████████████████████████████ ████████████.[2]

   hereinafter referred to as "██████ or "the 1st Respondent"[.]

**Regarding the Arbitral Tribunal's Analysis and Findings:**[3]

418.  <u>As to the Puyang Hospital</u>, it is not disputed by the Respondents that ████ represented to Classroom during the due diligence process, that Beijing Dongjun had entered into a binding, unconditional agreement to acquire a 100% equity interest in Puyang Hospital. Such representations were made in the following documents: in the Investor Presentation, in the September 2013 Sinowing Report, in the BDO Audit Report dated 23 October 2013, in the Draft Prospectus, and in the OM Company Review.  The fact that ████ provided to Classroom the Beijing Dongjun Puyang SPA dated 17 May 2013 , which had been signed by him, during the due diligence period, further confirmed Beijing Dongjun's acquisition of the Puyang Hospital.   It was further confirmed in the November 2013 Sinowing Opinion that as to: *"Puyang Hospital: [...]   It is confirmed that: (a) the agreement entered into with Beijing Dongjun and the 988 registered equity interest holders dated 17 May 2013 is valid, enforceable and subsisting; (b) the description of the agreement entered into with Beijing Dongjun and the 988 registered equity interest holders dated 17 May 2013 in Part B Section 1 of the DD Report [...]  is true and accurate and does not contain any omission of any provision, fact or circumstance that could have a material adverse impact on Beijing Dongjun; and (c) other than as described in Part B Section 1 of the DD Report (as extracted at Schedule 1) there are no other conditions or requirements to complete the acquisition."*. Such representation was repeated in the final January 2014 Sinowing Opinion, which was prepared *"following the instruction of"* China Hospitals and for the *"benefit and reliance of Classroom"*.   In addition to these pre-Transaction Representations, the Warrantors represented in the SPA that Beijing Dongjun had *"acquired 100% equity interests in Puyang Hospital from the 988 registered shareholders, registration pending to be changed upon payment according to the contract."*

419.  While these representations were made to Classroom at the end of 2013 – beginning of 2014, it is not disputed by the Respondents that as of May 2013, "████ *procured that both Beijing Dongjun and Beijing WSTP"* acquire interests in the Puyang Hospital. Moreover, the Respondents admit that *"the Beijing Dongjun Puyang SPA was never closed and rather, the BJ WSTP Puyang SPA was closed instead"*.  The Puyang Hospital

---

[1]   Capitalized terms used herein have the meanings given to such terms in the Final Award.

[2]   The following is excerpted from Final Award § 1.

[3]   The following is excerpted from Final Award §§ 418–25, 430–32, 436, 439–42, 452–54, 456, 459–60, 463, 489–90, 494–96, 499, 505, 511 (internal footnotes omitted).

Payment Agreement dated 17 May 2013 further confirms that Beijing Dongjun acknowledged the BJ WSTP Puyang SPA and agreed to pay the consideration of RMB 700 million *"on behalf of"* BJ WSTP.

420.   BJ WSTP's involvement in the acquisition of the Puyang Hospital before the Transaction is further confirmed by the Puyang Supplemental Agreement, by which ████ had put in place a mechanism to automatically terminate the Beijing Dongjun Puyang SPA. This appears in China Hospitals' response to Classroom dated 6 December 2014, in which it was answering Classroom's question relating to the coexistence of the Beijing Dongjun Puyang SPA and the BJ WSTP Puyang SPA.

421.   There is no dispute that BJ WSTP wholly owns the Puyang Hospital. The Respondents acknowledge that: *"In light of the restructuring, it was decided to complete the acquisition of Puyang Hospital through BJ WSTP rather than BJ Dongjun. Consequently, the Beijing Dongjun SPA was never closed and rather, the BJ WSTP Puyang SPA was closed instead."*

422.   <u>As to the Qingfeng Hospital</u>, the Respondents do not deny that ████ represented to Classroom during the due diligence process, that Beijing Dongjun had entered into a binding, unconditional agreement to acquire a 100% equity interest in Qingfeng Hospital before 29 January 2014. Such representations were made in the due diligence materials as for example, in the Investor Presentation, in the September 2013 Sinowing Report, in the BDO Audit Report dated 23 October 2013, in the Draft Prospectus, and in the OM Company Review. The fact that ████ provided to Classroom the Beijing Dongjun Qingfeng SPA, which had been signed by him, during the due diligence period, further confirmed Beijing Dongjun's acquisition process of the Qingfeng Hospital. Moreover, in the November 2013 Sinowing Opinion, ████ and China Hospitals stated that as to : *"Qingfeng Hospital: […] It is confirmed that: (a) the agreement entered into with Qingfeng County People's Government and Beijing Dongjun dated 19 April 2013 is valid, enforceable and subsisting; (b) the description of the agreement entered into with Qingfeng County People's Government and Beijing Dongjun dated 19 April 2013 in Part B Section 1 of the DD Report (as extracted at Schedule 1) is true and accurate and does not contain any omission of any provision, fact or circumstance that could have a material adverse impact on Beijing Dongjun; and (c) other than as described in Part B Section 1 of the DD Report there are no other conditions or requirements to complete the acquisition."* Such representation was repeated in the final January 2014 Sinowing Opinion, which was prepared *"following the instruction of"* China Hospitals and for the *"benefit and reliance of Classroom"*. In addition to these pre-Transaction Representations, the Warrantors represented in the SPA that Beijing Dongjun had *"acquired 100% equity interests in Puyang Hospital from the 988 registered shareholders, registration pending to be changed upon payment according to the contract"*.

423.   While these representations were made to Classroom at the end of 2013, ████ procured that Beijing WSTP acquire interests in the Qingfeng Hospital by executing the BJ WSTP Qingfeng SPA and Qingfeng Hospital Payment Agreement on 30 June 2013. The

Respondents do not dispute that BJ WSTP owns Qingfeng Hospital. They acknowledge that *"On 30 September 2014, in accordance with the customary restructuring plan, Beijing Dongjun transferred Qingfeng Hospital to BJ WSTP. In order to facilitate and expedite the listing process, BJ WSTP wrote to the Qingfeng government seeking its consent to treat Qingfeng Hospital as having been acquired by BJ WSTP from Qingfeng government directly. On 13 February 2015, Qingfeng Government consented to treat Beijing Dongjun 's rights and obligations under the Beijing Dongjun Qingfeng SPA as having been transferred to BJ WSTP as from 19 April 2013, the date of the Beijing Dongjun Qingfeng SPA."*

424.   There is no dispute that the purchase price for the Puyang Hospital and the Qingfeng Hospital was paid by Beijing Dongjun. The Respondents acknowledge that: *"After obtaining the [Xiamen] loans, Beijing Dongjun paid the acquisition prices for Puyang Hospital and Qingfeng Hospital, in accordance with the SPA."*

425.   There is no dispute that the amounts paid for the shareholding in the Qingfeng and Puyang Hospitals have been paid using the proceeds of the Subscription Monies.

430.   Moreover, ████ did not inform Classroom of the existence of these parallel agreements, neither at the time of the Transaction nor thereafter. Whereas ████ started restructuring as of the Spring 2014, Classroom only found out about the existence of these agreements in October 2014 when it received a term sheet for a bridge loan facility.

431.   This is further corroborated by the correspondence which demonstrates that until October 2014, ████ and China Hospitals have in fact always represented to Classroom that they were proceeding with Beijing Dongjun's acquisitions of the Puyang and Qingfeng Hospitals[.]

432.   Therefore, even after payment of the outstanding consideration due for the acquisition of the Puyang Hospital for the benefit of BJ WSTP, which took place on 24 March 2014, ████ ████ continued to represent to Classroom that Puyang Hospital had been acquired by Beijing Dongjun.

436.   The Arbitral Tribunal considers that no valid reason has been given to explain why ████ concealed the existence of BJ WSTP and its competing rights regarding the Puyang and Qingfeng Hospitals. Moreover, nothing proves that the decision to list China Healthcare was based on advice given to ████ after the Transaction. Even if ████ truly believed at the time of the Transaction that Beijing Dongjun was the only viable option to acquire the hospitals and had not determined which of BJ WSTP or Beijing Dongjun should be the acquiring entity of the Puyang and Qingfeng Hospitals, he should have said so to Classroom. The simple fact that ████ knew that BJ WSTP had entered into a contract to acquire the same shareholding in both hospitals renders his representation that Beijing Dongjun acquired those rights misleading. The representation that Beijing Dongjun had firm contractual rights to acquire 100% of the shareholding in the Puyang and Qingfeng Hospitals necessarily implies that there was no other company to ████ knowledge which had rights to acquire the same shareholding.

439.   According to the legal principles applying to fraudulent misrepresentation, a representor is liable for fraud if his representations imply additional facts which are false, or if facts are omitted which render that which has actually been stated false or misleading in the context in which it is made. As demonstrated above, the fact that ███ knew that there were competing SPA Agreements for the acquisition of the New Hospitals and the fact that he did not disclose it to the Claimant until he had to do so because he needed the Claimant's agreement relating to a bridge loan facility, makes his representations clearly misleading and constitute an act of a fraud.

440.   Considering that ███ procured the agreements for the acquisition of the Puyang and Qingfeng Hospitals by BJ WSTP to be executed, that he signed the BJ WSTP Puyang and Qingfeng SPAs as legal representative of BJ WSTP, and that he was sole director, manager and legal representative of Beijing Dongjun, as well as a director and majority shareholder of China Hospitals, and a director and manager of Raisechina, there is no doubt that China Hospitals, and the Warrantors knew that their pre-Transaction representations and SPA representations relating to the acquisition of the said Hospitals by BJ Dongjun were not true at the time of the Transaction.

441.   As to the Anqiu and Shouguang Hospitals, it is not disputed that ███ and China Hospitals represented to Classroom during the due diligence process, that Beijing Dongjun was registered as having a 100% legal and equitable interest in both Anqiu and Shouguang Hospitals as at 29 January 2014, and that deferred outstanding consideration would be paid before 31 December 2014 out of the proceeds of the investment which the China Hospitals Group was seeking.  A late payment would not lead to loss of ownership. These representations were made in the Investor Presentation, in the September 2013 Sinowing Report, in the BDO Audit Report, in the Draft Prospectus, in the OM Company Review, in the November 2013 Sinowing Opinion, in the Investor Presentation, and in the January 2014 Sinowing Opinion.  They were affirmed by ███ during discussions in the due diligence process.

442.   Eventually, when Classroom instructed Haiwen in April 2016 to conduct an inspection of the relevant ownerships records held at the relevant CADs for each of the Five Hospitals, it emerged that the Anqiu and Shouguang CADs did not reflect Beijing Dongjun as their 100% owner, but rather as owning only a minority interest in each Hospital. Beijing Dongjun had only a 13.8% ownership interest in Anqiu Hospital and a 32% ownership interest in Shouguang Hospital.  This is not denied by the Respondents.

452.   Moreover, during the due diligence process, ███ and China Hospitals provided to Classroom documents proving that the registration of Beijing Dongjun's 100% ownership had been requested with the CAD records, such as the Anqiu Application Form and the Shouguang Application Form which both purported to bear a CAD stamp.

453.   By these representations, ███ irrefutably represented to Classroom that Beijing Dongjun already held 100% in the Shouguang Hospital, the Anqiu Hospital and the Menghzou Hospital. The fact that the CAD Record does not reflect Beijing Dongjun' s 100% ownership of these hospitals leads to the conclusion that the information provided by the Respondents at the time of the Transaction was wrong. Whether the former owners

4

of the Shouguang Hospital and the Anqiu Hospital raised the price for their shares during Spring 2014 or not, is irrelevant. When the Respondents made the representation to Classroom, it was their duty, not Classroom's, to ensure that Beijing Dongjun's ownership was true, and had truly been registered. Whereas the Respondents allege that they took all necessary measures to ensure that Beijing Dongjun's ownership was registered with the relevant CAD and that they truly believed it was, no evidence whatsoever has been provided to support this assertion.

454.  It follows from the above that the representations made to Classroom during the due diligence process as to the Shouguang and Anqiu Hospitals were false.

456.  ███████ was the sole director, manager and legal representative of Beijing Dongjun when Beijing Dongjun entered into the acquisition agreements to acquire its interest in the Anqiu and Shouguang Hospitals. There is no evidence that he ever caused Beijing Dongjun to be registered as 100% owner of the Anqiu and Shouguang Hospitals. Therefore, the Arbitral Tribunal is satisfied that he was aware that the representations referred to above in §§ 449 to 452 were false or, at least, he was reckless as to whether they were true. Since ███████ was sole director, manager and legal representative of Beijing Dongjun, as well as a director and majority shareholder of China Hospitals, and a director and manager of Raisechina, the Arbitral Tribunal is satisfied that China Hospitals, and the Warrantors knew that their Pre-Transaction Representations and SPA Representations relating to the ownership of the said Hospitals by BJ Dongjun were not true at the time of the Transaction.

459.  ███████ and therefore China Hospitals knew that the BJ WSTP Puyang Agreement was executed on 17 May 2013 and that the BJ WSTP Qingfeng Agreement was executed on 30 June 2013. This implies that when they entered into the SHA, they knew that the acquisition of Puyang and Qingfeng by Beijing Dongjun, and indirectly by China Hospitals, was compromised from the very beginning. This was therefore jeopardizing the conditions for the completion of the China Hospitals IPO. It is not disputed by the Respondents that the IPO contemplated in the SHA did not take place nor that the Respondents misdirected the funds in breach of the Fund Flow Mechanics so that the Puyang and Qingfeng Hospitals were acquired for the benefit of BJ WSTP and indirectly for China Healthcare, in which Classroom has no interest.

460.  Since ███████ was the director and majority shareholder of China Hospitals, and the sole shareholder of the Existing Shareholders, the Arbitral Tribunal is satisfied that China Hospitals, and the Existing Shareholders knew that the representation they made in the SHA as to their intention with regard the IPO referred to therein was not true at the time of the Transaction.

463.  The Arbitral Tribunal is satisfied that without the Representations made by ███████ Classroom would not have entered into the SHA and the SPA. Consequently, ███████ China Hospitals, the Warrantors and the Existing Shareholders are liable for fraudulent misrepresentation. The Arbitral Tribunal declares that the SHA and the SPA have therefore validly been rescinded by the Claimant by the commencement of the Hong Kong Proceedings and the filing of the Statement of Claim on 6 May 2015 in those

Proceedings, where the Claimant requested the Court to declare that it was entitled to rescind these agreements and had rescinded them by the commencement of their action.

489.   For the above reasons, the Arbitral Tribunal is convinced that the Respondents made the fraudulent misrepresentations in order to convince Classroom into investing in China Hospitals while at the same time ██████ had no real intention to proceed with the IPO of the shares of this specific entity.

490.   The expert evidence adduced by Classroom, which has not been challenged or rebutted by the Respondents, shows that ██████ caused the USD 175 million paid by the Claimant to be subject to a large number of transactions, many of which lack any commercial rationale.

494.   In summary, the Supplemental A&M Report confirms that out of the sums invested by Classroom, USD 166.75 million flowed through from the China Hospitals Group to the Healthcare Group and onwards as follows:
   (a)   Payments to Third Parties totalled USD 109.81 million;
   (b)   Professional fees and bank charges totalled USD 3.53 million;
   (c)   HK WSTP's time deposits with Xiamen Bank totalled USD 50.47 million; and
   (d)   Residual balances of the Investment Sum held in China Hospitals Group or Healthcare Group bank accounts totalled USD 3.44 million.

495.   In their Supplemental Report, they also note that, based on the additional documents produced by the Respondents:

   ●   RMB 577.77 million (rather than RMB 607.77 million) of the Xiamen Loans was used by Beijing Dongjun to acquire the entire interest or shareholding in the Puyang Hospital for and on behalf of BJ WSTP; and
   ●   RMB 100 million (rather than RMB 91.23 million) of the Xiamen Loans was used by Beijing Dongjun to pay income tax relating to the Puyang Hospital for and on behalf of BJ WSTP.

496.   It follows from the above that after the Claimant invested USD 175 million in China Hospitals after being induced to enter into the SPA on the basis of fraudulent misrepresentations, the assets it invested have been misappropriated by ██████ and transferred in an anarchic way to its various companies, in breach of the Fund Flows Mechanic.   Therefore, the Arbitral Tribunal is satisfied that further to the Transaction, Classroom suffered substantial damage.

499.   First, the Arbitral Tribunal is satisfied that the combined actions of ██████ China Hospitals, Raisechina, Beijing Dongjun, Dragon Dosan, Best Strive, Fortune Global, Wonder Effect and Capital Basin contributed to cause the Claimant's damage.   Indeed, under the supervision of ██████ the said entities made the fraudulent misrepresentations referred to above so as to influence Classroom to enter into the SPA and SHA and invest USD 175 million.   As confirmed by *Clerk & Maxwell,* a company, being a separate legal

6

person, can conspire with its directors, and the knowledge of the company may be found in the person who has the management or control for the transaction or act in question.

505.   As established above, the knowledge of the company may be found in the person who has the management or control for the transaction or act in question. Since all of the Third Parties (but for ████████ were controlled at relevant times by ████ and since the combination of all of their acts referred to above contributed to help ████ deviate Classroom's funds, the Arbitral Tribunal is satisfied that the Third Parties knew that their acts would be harmful to Classroom. Consequently, the Arbitral Tribunal is satisfied that the combination of the Third Parties' acts constituted unlawful means by which they intended to cause damage to Classroom.

511.   Applying the principles cited above, the Arbitral Tribunal is satisfied that unlawful means have been used to cause damage to Classroom. Those means were fraudulent misrepresentation, unlawful use of the Subscription proceeds, and dishonest assistance to cause fraudulent misrepresentation amongst others. ████ and ████ were the controlling minds of the companies involved in the scheme which caused Classroom to invest in China Hospital on the basis of fraudulent misrepresentations, while they knew that the funds invested would be misappropriated to the benefit of Healthcare, in which Classroom had no interest. The Respondents' intention is evidenced by the fact that it could be reasonably foreseen that their concerted action would cause loss to Classroom.